## TEXARKANA NAT. BANK et al. v. EALEY.

### No. 3831.

Court of Civil Appeals of Texas. El Paso.

May 25, 1939.

King & Wheeler, of Texarkana, for appellants.

Wm. V. Brown, of Texarkana, for appellee.

HIGGINS, Justice.

Appellants, the holders of the record title, filed this suit December 22, 1937, against Sam Ealey to recover a tract of land containing 12.24 acres. The defendant pleaded the ten years' statute of limitation. This issue was submitted to the jury and found in defendant's favor. In accordance wherewith judgment was rendered, and the plaintiffs appeal.

Upon the trial the defendant testified as follows on direct examination:

"Q. Did you know who was the owner of that land when you went there? A. I did not.

"Q. Did you try to find out? A. Yes, sir.

"Q. Could you ascertain who owned it? A. No, sir, I could not find out anything.

"Q. Then what did you do? A. I came to Boston here and I inquired to try to get a trace on it, and I could not do it. They said they had no record of that portion of land in there connected with the Crossarm and the east end of it.

"Q. The north end? A. Yes, and they said they had no record on no such land.

"Q. Then what did you do? A. I just went on and claimed it for my own, because nobody never came there to controverse anything about it, and I went ahead and used it and kept the people off of it. * * *"

On cross examination:

"Q. This place, you say you saw that land over there, and you concluded you would find out who owned it? A. Yes; sir.

"Q. What was your idea in that? A. The first idea, I had some cattle—I went to West Texas and I had a bunch of cattle.

"Q. What kind of cattle? A. Cows—you understand, cattle and mules and things.

"Q. How many cattle? A. Three or four, and I carried them out on Grand View. My brother was out there and he kept them while I was gone to Texas.

"Q. You have been testifying you were very poor and trying to get hold of money. You were not trying to buy that land? A. Where?

"Q. Where you claim now? A. I just went out there seeking a place for shelter until I could do better. All I had burned up, and I was seeking some place to live until I could do better; and if anyone come there that owned it, I was willing to pay for it, but they didn't come, and I just stayed there.

"Q. You were still living there in the place it took five years to build? A. Only until about 1927. * * *

"Q. You say you inquired around to find out who owned that land? A. Yes, sir.

"Q. Did you go to Mr. Heilbron to ask him about it? A. I don't know if I did.

"Q. Mr. Krouse? A. No, sir.

"Q. Mr. Collins? A. No, sir.

"Q. Any of the real estate men? A. None—but I worked, you see, I was working, you see, and didn't have no time much. I asked and thought whoever owned it— * * *

"Q. You say you come up to Boston, that you wanted to pay taxes on it? A. I thought maybe I could find out who it belonged to.

"Q. Who did you see at Boston? A. Some of the office men, I don't know just who it was, but I came up here on some other business, and I tried to find out the taxes on it, and he asked me where the land was, and he said he didn't have any tax slip on any such land as that, and I knew then I could not do anything about it until somebody come, and last June a man came and said they had no record on any such land. There was a gentleman came from New Boston last April, I don't know just what date, he came to me and asked me did I know who was the old headright of that land, and I told him I did not, and then he asked me how long had I been on that land, and then I told him I had been on there sixteen or seventeen years,

so he went on down and asked Mr. Mansur who did own the land.

"Q. That man did? A. Yes, sir.

"Q. Were you with him when he did that? A. No, sir, I was not.

"Q. When you come here to Boston, what office did you go to? A. Up yonder first, there on the corner.

"Q. Which one of the corners? A. The fur corner, I think.

"Q. You went in there? A. Yes, sir.

"Q. What did you tell them when you went in there? A. I was kinder inquiring about some other land—I asked them, pictured to one of them where the land was, and I could not get no sense out of him, he could not say who it belonged to. He called Mr. Tilson and Mr. Heilbron, and that was all the land showed in there, and he said he didn't have no other land in there.

"Q. What other land were you inquiring about? A. I said I came up here on some business and thought of the land and went in there and inquired about it while I was there.

"Q. Didn't you say you inquired about other land? A. About this land, as to who was the owner.

"Q. What other land did you inquire about? A. I didn't know no other land.

"Q. Didn't you tell Mr. Brown you were trying to pay the taxes on it, and you couldn't because you could not find out who it belonged to? A. No, that wasn't my intention, but it seems to me when I was there so long and nobody turned up, and I questioned some men about it, and they said stay there until somebody comes, and I am not a lawyer and I stayed there.

"Q. Who said that? A. Lots of people.

"Q. Name some of them. A. Mr. Spivey and Mr. Brown a time or two.

"Q. You never said anything to Mr. Brown about it until later? A. I don't know, I would not say for positive that I did, but I have asked several. I know that Mr. Spivey, I taken it up with him five or six years ago.

"Q. Did you ever talk to Mr. Jodie Kirby about it? A. Yes, Sir.

"Q. Did you see the sign he put up on that land, 'Keep off this land?' A. Yes, sir.

"Q. You and him were sorter working together, weren't you? A. I will tell you how that occurred. This man I am telling you about, I was in the field about 11 o'clock, and he came there and asked me

did I know any of the old headrights, and I said no.

"Q. That was the cotton man? A. No, but a man seemingly trying to find out about that land. I told him maybe Mr. Kirby can tell you. I said Mr. Kirby had been in this country a good long while, and maybe he can tell you who owns this land, and he says 'How long have you been there?' and I said 17 years. That was about 11:30 or 11, and when I got to the house Mr. Kirby was there, and he said 'I seen the man while ago, and I have an interest in that land through mine and Mr. Krouse's transactions, and he said it isn't on record, but I have had some dealings or some deeds made, me and Mr. Krouse, and if you will accept it, I will take half of it and you half,' and I said 'If you have the title I will do that,' and Mr. Kirby went down there without me and put up some signs, and I went and looked at the signs and said what did they mean or were doing there, and I took my hatchet and knocked them down and throwed them over the fence.

"Q. Didn't you get Mr. Kirby to go to the bank and claim it and that you were his tenant? A. That was Mr. Kirby's dictation—he said he could get the title, and I told him if he could I would accept half of it.

"Q. You say if he did get it, you would be his tenant? A. He said that. He said he was going to get the title and give me half the land, and I said I would be satisfied.

"Q. Didn't he say he would have to show you were his tenant? A. No, he didn't say anything like that to me. He asked if I would agree to it and I said yes, if he would give me my half and settle with Mr. Mansur. * * *"

In Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24, it was said:

"Defendant's own evidence is that when he entered on the land he did not know who owned it; but after the entry he made inquiry for the owner, that he might buy it, and agreed with Stone that they would buy it together; that he and Stone made frequent inquiry for the owner, that they might buy it, until it was sold for taxes, and bid in by one Williams, June 3, 1879. He testified that soon after this he bought the land from Williams, and then sold the north half to Stone. The witness Stone corroborates this statement, and adds that they employed a land agent to look up the owner. Such a possession would not be inconsistent with that of the owner. It does not indicate a claim hostile to the owner's title. Such acts and declarations manifest a holding in subordination to the real title. * * *

"Having once held in subordination and recognition of the real title, he could not make it a hostile holding without a repudiation of the title, evidenced by acts or declarations clearly manifesting that intention. * * *"

From Texas West. Ry. Co. v. Wilson, 83 Tex. 153, 18 S.W. 325, 326, we quote: "We will next in order inquire whether the claim to and the exercise of right (conceding it to have been exercised) was adverse to the owner of the land. The testimony of John T. Brady, one of the directors, affords the only proof bearing immediately upon the point. That part of his evidence to which we refer is as follows: That John Koops (the owner of the land) at the time 'lived in Houston, but was away from the city,' he thinks, 'when the road was built. We went on the land and have never paid for the right of way. We expected and intended to pay for it when called upon at any time by the owner.' There is no proof of any demand for possession or compensation, or a refusal thereof by the defendant, prior to the institution of this suit. We think that these facts do not show an intent to prescribe for a use and enjoyment of the easement under a claim of right in the defendant, independent of and antagonistic to the owner of the land. The inference might be drawn by the court below that the inception and user of the right of way was in subordination to the owner, and in recognition of his superior rights in the premises, and, if so, we cannot hold, under well settled rules of law, that the conclusion was unwarranted by the facts proved. A single act of acknowledgment by the defendant of the owner's title is fatal to the right." See also Whitaker v. Thayer, 38 Tex.Civ.App. 537, 86 S.W. 364; Leon & H. Blum Land Co. v. Rogers, 11 Tex.Civ.App. 184, 32 S.W. 713; and Word v. Drouthett, 44 Tex. 365.

The testimony of Ealey as quoted shows his entry upon and possession of the land was in recognition of and in subordination to the title of the true owner of the land from whom he was desirous of purchasing if he could ascertain who such owner was. The testimony shows beyond

question that Ealey's possession was not hostile to the true owner and therefore not adverse.

Appellants' assignments questioning the sufficiency of the evidence to support the finding in defendant's favor are sustained.

█ The criticism of the definition of "adverse possession" as given in the court's charge is without merit.

Reversed and remanded.